[Civ. No. 38096. First Dist., Div. One. June 16, 1976.]

JOYCE GIBBS et al., Plaintiffs and Respondents, v.
CITY OF NAPA et al., Defendants and Respondents;
CITIZENS AGAINST THE DESTRUCTION OF NAPA et al.,
Interveners and Appellants.

150

## COUNSEL

Vic A. Fershko for Interveners and Appellants.

Dickenson, Peatman & Fogarty and David W. Meyers for Plaintiffs and Respondents.

Frank L. Dunlap, City Attorney, and W. Scott Snowden, Deputy City Attorney, for Defendants and Respondents.

## OPINION

**ELKINGTON, J.**—Plaintiffs Joyce Gibbs, Gordon Eby and Mildred Cunningham sought a writ of mandate directing the City of Napa, and

certain of the city's officials, not to proceed with a proposed initiative election sponsored by Citizens Against the Destruction of Napa, an unincorporated association, Lawrence Friedman and Arthur Stewart, Jr. (hereafter "interveners"). The interveners appeal from a judgment directing the writ to issue.

The proposed election was based upon an initiative petition which procedurally had qualified for a vote thereon by the city's electors. Its content follows:

"The People of the City of Napa do ordain as follows:

"WHEREAS, the Napa Community Redevelopment Agency has repeatedly failed to preserve Napa's cultural heritage by irreversibly destroying the unique character of downtown Napa; and

"WHEREAS, by enacting this ordinance, the people of Napa seek to preclude further expansion beyond the original nine-block core area as described in the Urban Redevelopment Plan for the Parkway Plaza Redevelopment Project; and

"WHEREAS, by enacting this ordinance, the people of Napa seek to preclude further destruction to our City beyond the original nine-block core area described hereinabove; and

"WHEREAS, as of the date this ordinance becomes effective, it is found and determined that there is no further need for the Napa Community Redevelopment Agency to function in the City of Napa beyond those operations within the original nine-block core area described hereinabove,

"Now, THEREFORE, be it ordained as follows:

"1. Immediately upon the completion of operations within said original nine-block core area as defined in the Urban Redevelopment Plan for the Parkway Plaza Redevelopment Project, there shall be no further need for said Agency to continue to function.

"2. Immediately upon the completion of operations within said original nine-block core area as hereinabove described, the offices of the Agency members shall be vacated and the capacity of the Agency to transact business or exercise any powers shall be suspended until the

City Council of the City of Napa shall adopt an ordinance declaring the need for said Agency to function.

"3. Should any provision in this ordinance be found or determined to be invalid or unconstitutional, the remaining portions hereof are intended to be severed therefrom and to remain in full force and effect.

"Dated, this 30 day of September, 1974."

In 1962 the Council of the City of Napa had, by ordinance, declared a need for the functioning of the Napa Community Redevelopment Agency. The city council had elected to exercise the powers granted to the agency according to Health and Safety Code section 33003. Thereafter in 1969 the council by ordinance adopted an urban redevelopment plan. Pursuant to that plan nine blocks in the downtown area of the city were scheduled for redevelopment. Then in 1973 the council amended its earlier ordinances to provide for several additional contiguous city blocks in "the plan of property for acquisition and clearance" by the redevelopment agency.

The amendatory ordinance of 1973 had thus adopted an "urban redevelopment plan."

I. ■■■ The first question presented to us on the interveners' appeal is whether their proposed ordinance was a proper subject of the initiative process.

A brief consideration of the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.) seems desirable at this point.

"There is in each community a public body, corporate and politic, known as the redevelopment agency of the community." (§ 33100.)

The redevelopment agency, however, shall not "transact any business or exercise any powers" until and unless the community's "legislative body declares that there is need for [the] agency to function . . . ." But the ultimate policy determination whether the agency shall function is confided to the community's electorate. "The ordinance of the legislative body declaring that there is need for an agency to function in the community *shall be subject to referendum* as prescribed by law . . . ." (§ 33101; italics added.) Such referendum proceedings are commenced by

submission of an appropriate petition to the clerk of the city council within 30 days of the adoption of the ordinance. (Elec. Code, § 4051.)

The policy question, whether a city's redevelopment agency shall function, is of a legislative nature. But when the need for the agency to function is determined, "all considerations of wisdom, policy and desirability connected with the functioning of a redevelopment plan [become] settled . . . ." The agency's acts thereafter fall "within the executive or administrative functions." And case authority makes it "clear that once the legislative policy is established . . . the administrative acts following therefrom are not subject to referendum." (*Andrews* v. *City of San Bernardino,* 175 Cal.App.2d 459, 462-463 [346 P.2d 457]; see also *In re Redevelopment Plan for Bunker Hill,* 61 Cal.2d 21, 39 [37 Cal.Rptr. 74, 389 P.2d 538] [cert. den., 379 U.S. 899 (13 L.Ed.2d 174, 85 S.Ct. 185)]; *Housing Authority* v. *City of L. A.,* 38 Cal.2d 853, 862 [243 P.2d 515] [cert. den., 344 U.S. 836 (97 L.Ed. 651, 73 S.Ct. 46)]; *Housing Authority* v. *Superior Court,* 35 Cal.2d 550, 557 [219 P.2d 457]; *Walker* v. *City of Salinas,* 56 Cal.App.3d 711, 715-718 [128 Cal.Rptr. 832]; *Lincoln Property Co. No. 41, Inc.* v. *Law,* 45 Cal.App.3d 230, 233-234, 236 [119 Cal.Rptr. 292]; *Valentine* v. *Town of Ross,* 39 Cal.App.3d 954, 959 [114 Cal.Rptr. 678]; *Duran* v. *Cassidy,* 28 Cal.App.3d 574, 580-581 [104 Cal.Rptr. 793].)

The Charter of the City of Napa expressly provides that: "There shall be an initiative," the mode and form of which shall be in accordance with the applicable general laws of the state. (Stats. 1972, res. ch. 142, p. 3431.)

An analysis of the interveners' proposed initiative ordinance discloses that its effect, and apparent purpose, would be to nullify the urban redevelopment plan adopted by the city council's 1973 ordinance. Such a result, as we have shown, would have been prohibited under the referendum process, for the plan's adoption was an executive or ministerial act. It is settled that an initiative ordinance may not be used to undo such an act which is beyond the reach of referendum proceedings. ■ " 'A proposed initiative ordinance cannot be used as an indirect or backhanded technique to invoke the referendum process' " where the latter process is unavailable. (*Dare* v. *Lakeport City Council,* 12 Cal.App.3d 864, 867 [91 Cal.Rptr. 124]; *Myers* v. *City Council of Pismo Beach,* 241 Cal.App.2d 237, 243 [50 Cal.Rptr. 402]; and see *Campen* v. *Greiner,* 15 Cal.App.3d 836, 843 [93 Cal.Rptr. 525].)

██ Other reasons demonstrate the proposed initiative ordinance's invalidity. When a municipal council, as here, declares a need for the redevelopment agency to function, the agency thereby becomes a state agency when acting in redevelopment matters. The council functions as an administrative arm of the state because it pursues a state concern and effectuates a state legislative policy. The functioning of such an agency is beyond the reach of, or control by, a municipal initiative or referendum election. (See *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d 21, 39; *Walker* v. *City of Salinas, supra,* 56 Cal.App.3d 711, 718; *Andrews* v. *City of San Bernardino, supra,* 175 Cal.App.2d 459, 461-463.)

II. ██ The interveners point out that the redevelopment agency did not function at all for a period of seven years after the city council declared a need for its functioning in 1962. In such a case, they argue, Health and Safety Code section 33140 permits the city's legislative body "by ordinance [to] declare that there is no further need for the agency."[1] They then reason that such a declaration is a matter of legislative policy within the proper scope of the initiative process.

It will be seen that section 33140 permits such an ordinance by the city council when the redevelopment agency has not functioned for "two years after the adoption of an ordinance" declaring a need for it to function. A literal interpretation of the statute would lend aid to the instant contention.

But we observe that there is no statutory or other prohibition of a redevelopment agency's tardy functioning, nor does it appear that its acts after such a nonfunctioning hiatus of two years are invalid. It would be wholly unreasonable to ascribe a legislative intent that the functioning of a redevelopment agency with current contracts and commitments, and other ongoing activity—in which the public interest and rights of others are deeply involved—might be abruptly terminated, because some years

---

[1] *The full text of Health and Safety Code section 33140 follows:* "If an agency has not redeveloped or acquired land for, or commenced the redevelopment of, a project, or entered into contracts for redevelopment within two years after the adoption of an ordinance pursuant to Section 33101, or, in the case of an agency authorized to transact business and exercise powers by resolution adopted pursuant to the provisions of Section 33101 which were in effect prior to the adoption of such resolution, the legislative body may by ordinance declare that there is no further need for the agency. Upon the adoption of the ordinance the offices of the agency members are vacated and the capacity of the agency to transact business or exercise any powers is suspended until the legislative body adopts an ordinance declaring the need for the agency to function."

earlier there had been a two-year gap of inactivity. " ' "The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." ' " (*Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].) And it is "the duty of the courts, whenever possible, to interpret statutes so as to make them workable and reasonable." (*City of Santa Clara* v. *Von Raesfeld,* 3 Cal.3d 239, 248 [90 Cal.Rptr. 8, 474 P.2d 976].)

 We interpret Health and Safety Code section 33140 as permitting a municipal legislative body to declare by ordinance "that there is no further need for the [redevelopment] agency" when it has not functioned during the *preceding two years.* There is accordingly no merit in interveners' instant contention. We need not and do not determine whether, in an otherwise proper case, the procedure of the statute would be available to the city's voters under the initiative process.

III. Relying upon *Gayle* v. *Hamm,* 25 Cal.App.3d 250 [101 Cal.Rptr. 628], the interveners contend that since the invalidity of their proposed initiative ordinance was not "clear beyond question," the superior court should have permitted its submission to the city's electorate, and left the issue of its validity for judicial determination at a later date. We opine, for the reasons we have pointed out, that the ordinance's invalidity was clear beyond question according to the standards of *Gayle* v. *Hamm,* and that the superior court accordingly did not err in ruling upon that issue.

IV. Interveners recognize that had their proposed ordinance been voted upon and passed by the electorate, the city council might nevertheless have legally nullified the election by again declaring, under Health and Safety Code section 33101, a "need for [the] agency to function." They say that their principal purpose was to present to the city council, for its consideration, an expression of the public will that Napa's community redevelopment be ended, or at least restrained. It is argued: "Since well over 15% of the city electorate had petitioned the City Council for the opportunity to vote on this matter, the City Council's decision to place the matter on the ballot seemed most prudent. The election would determine once and for all what direction the city legislative body should pursue in the future vis-a-vis Redevelopment."

But it will be noted that the proposed ordinance purports, by its terms, to be much more than a declaration of policy for the guidance, or consideration, of the city council; it would revoke the council's 1973 redevelopment plan and it would declare, effective at a fixed future time, no need for the agency's further functioning.

We think the interveners have followed the wrong procedure to effectuate their purpose. They might properly have proposed an initiative ordinance directly expressing the public will concerning "what direction the city legislative body should pursue in the future vis-a-vis Redevelopment." Such an ordinance would be proper even though the city council would not be bound thereby. Authority for such a procedure is found in *Farley v. Healey,* 67 Cal.2d 325 [62 Cal.Rptr. 26, 431 P.2d 650].

In *Farley v. Healey* a municipal charter provided (p. 328): " 'The registered voters shall have power to propose by petition, and to adopt or reject at the polls, any ordinance, act or other measure which is within the power conferred upon the board of supervisors to enact, or any legislative act which is within the power conferred upon any other board, commission or officer to adopt, or any amendment to the charter. . . . [¶] Any declaration of policy may be submitted to the electors in the manner provided for the submission of ordinances; and when approved by a majority of the qualified electors voting on said declaration, it shall thereupon be the duty of the board of supervisors to enact an ordinance or ordinances to carry such policies or principles into effect, subject to the referendum provisions of this charter.' " There was presented to the proper city officials (p. 326) "a petition to place an initiative measure [termed a "declaration of policy"] on the ballot urging an immediate ceasefire and American withdrawal from Vietnam." On advice of the city's attorney the petition was rejected. Exercising its original jurisdiction, the Supreme Court (p. 329) mandated the city and its appropriate officials to "determine the sufficiency of the signatures to the petition and, if determined to be sufficient, to place the proposed initiative on the ballot . . . ."

The high court emphasized (p. 328) that the "power of initiative must be liberally construed . . . to promote the democratic process." It was found to be of no moment that the city's legislative body would be unable to place the measure's proposed policy into effect. It noted (p. 328) that the charter reserved to "the people the power to initiate 'any ordinance, act or other measure which is within the power conferred

upon the board of supervisors to enact. . . .' As representatives of local communities, boards of supervisors and city councils have traditionally made declarations of policy on matters of concern to the community whether or not they had power to effectuate such declarations by binding legislation." The court then said (p. 329) that only by construing the charter "narrowly against the power of initiative could it be held that the voters may only declare policies that the supervisors could effectuate by ordinance."

The *Farley* v. *Healey* court then expressed a principle relating to the issue immediately before us. It stated (p. 329) that even had the city's charter not *expressly* authorized the proposed initiative measure, nevertheless "the proposed initiative is authorized, for the board of supervisors can enact ordinances carrying out the policy of the declaration to express the popular will. The board by ordinance can use the avenues of advocacy available to it to express that will. It can, for example, direct its legislative representative in Washington to make the people's position known, rename streets or buildings, or order the posting of the declaration in public buildings. [¶] The charter contains a numerical requirement [as does that of the City of Napa] as a built-in safeguard against frivolous use of the initiative process. There is no other limitation that prevents petitioners from submitting their measure to a general vote."

It is of course the general rule, applicable here, that in situations where a municipal legislative body may enact an ordinance, so also may the city's electors by the initiative process. "It is well recognized that 'an ordinance proposed by the electors of a county or city of this state, under the Initiative Law must constitute such legislation as the legislative body of such county or city has the power to enact under the law granting, defining and limiting the powers of such body' . . . ." (*Blotter* v. *Farrell,* 42 Cal.2d 804, 810 [270 P.2d 481].)

The judgment is affirmed.

Molinari, P. J., and Sims, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 12, 1976.